**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| NICOLAS BALAGIANNIS and RESERVE HOTELS PTY LIMITED as trustee for the NBF TRUST, | )<br>)<br>) |
| | ) Case No.  08 C 943 |
| Plaintiffs, | )<br>) Judge Leinenweber |
| v. | )<br>) Magistrate Judge Brown |
| THEODORE MAVRAKIS, | )<br>) |
| Defendant. | ) |

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION .......................................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 1

ARGUMENT .................................................................................................................................. 4

    I.   The Court Should Deny Defendant's Motion to Dismiss this Action under
        Rule 12(b)(7) Because Costas Is Not an Indispensible Party ........................................... 4

        A.  Costas Is Not an Indispensible Party to this Action........................................... 4

        B.  Even If Costas Was an Indispensible Party, the Court Should in Equity
            and Good Conscience Allow this Action to Proceed between the
            Existing Parties ................................................................................................... 6

    II.  The Court Should Deny Defendant's Motion to Dismiss Count II of the
         Complaint Because Plaintiff Has Sufficiently Alleged a Claim to Enforce
         a Personal Guaranty ......................................................................................................... 7

        A.  The Language Ted Used Was Sufficient to Create a Guarantee Under
            Illinois Law ........................................................................................................ 7

        B.  Defendant's Guaranty Was Supported by Consideration to Both
            Mavrakis Brothers.............................................................................................. 9

        C.  Ted's Letter Guaranteed Payment, Not Mere Collection ................................. 10

   III. The Court Should Deny Defendant's Motion to Dismiss Count III of the
        Complaint Because Plaintiff Has Sufficiently Alleged a Claim for
        Promissory Estoppel ...................................................................................................... 10

        A.  Promise ............................................................................................................. 11

        B.  Reasonable Reliance ........................................................................................ 11

   IV. The Court Should Deny Defendant's Motion to Dismiss Count IV of the
        Complaint Because Plaintiff Has Sufficiently Alleged a Claim for Fraud ...................... 12

        A.  Balagiannis' Complaint Includes More than "Blanket Allegations" of
            Fraudulent Misrepresentations......................................................................... 12

        B.  Ted Has Not Shown that there Are No Set of Facts under which
            Balagiannis Could Prove that He Reasonably Relied on Ted's
            Misrepresentations ........................................................................................... 12

CONCLUSION............................................................................................................................. 13

## INTRODUCTION

Nearly five years ago, Nicolas Balagiannis[1] became one of several victims defrauded by Costas and Ted Mavrakis and lost $4.5 million. Costas Mavrakis initiated the fraud by persuading Balagiannis to loan him $4.5 million to pay legal fees and to buy Ted's position in a Greek casino. Costas borrowed $500,000 from Balagiannis to allegedly cover his legal expenses in a lawsuit accusing him of misappropriating corporate funds and assets of the casino and the remaining $4 million was to be used to purchase Ted's stock in the casino. Costas ultimately obtained $800,000 directly from Balagiannis but, contrary to their agreement, spent it on personal expenses. The remaining $3.7 million was sent to an escrow account at Chicago Title & Trust Company that was to be used to close the sale of Ted's stock. With Ted's assistance, Costas succeeded in obtaining the remaining $3.7 million from escrow and fled to Greece. Balagiannis now seeks redress from Ted for his role in the fraud and Ted moves to dismiss his complaint. For the reasons that follow, the motion should be denied.

## STATEMENT OF FACTS

The company at the center of this dispute is Theros Gaming International, Inc., which was incorporated in Illinois on July 29, 1994 to acquire and operate a casino in Greece. (Complaint ("*Compl.*"), Ex. A ¶ 1.1).[2] In March of 1997, the Mavrakis brothers acquired control of Theros by buying all of the company's shares except those held by Michael Rose.

---

[1] Balagiannis, in connection with this transaction, was acting on behalf of Reserve Hotels PTY Limited as trustee for the NBF Trust.

[2] When incorporated, Theros was owned by ten investors who held the following ownership interests in the company:

| | |
|---|---|
| Costas Mavrakis | 13.30% |
| Ted Mavrakis | 13.30% |
| Michael Rose | 13.40% |
| Charles W. Bidwell III | 16.668% |
| Edward T. Duffy | 8.334% |
| Linda M. Krol | 8.334% |
| Lawrence W. Brown | 8.334% |
| John R. O'Donnel | 6.447625% |
| Michael J. Jacobson | 6.447625% |
| Timothy Rand | 5.43475% |

(*Compl.*, Ex. A ¶ 1.2).

1

(*Id.*).  After the acquisition, Rose determined that the Mavrakis brothers bought those shares with Theros' corporate funds.  (*Id.*).  As a result, he sued the Mavrakis brothers seeking restoration of his ownership interest in the company and other relief arising from their alleged breach of their fiduciary obligations.  (*Id.*).

While litigation was pending between Rose and the Mavrakis brothers, Ted decided to sell his shares to a third party, Kostas Piladakis.  (*Compl.*, Ex. A ¶ 1.3).  However, Costas Mavrakis objected to the sale and filed suit in the Circuit Court of Cook County asserting a right of first refusal to his brother's shares in Theros.  (*Id.*).  On March 18, 2003, the Circuit Court of Cook County ruled in Costas' favor and held that he was entitled to acquire his brother's shares by matching Piladakis' $9 million offer—$4 million in cash plus a $5 million promissory note— and obtaining a release from Rose.  (*Id.*).

Though eager to acquire his brother's shares, Costas did not have $4 million to consummate the transaction.  (*Compl.* ¶ 13).  He solved this problem by finding a financial backer:  Nicolas Balagiannis.  (*Id.*).  Costas arranged to borrow $4 million from Balagiannis to acquire his brother's shares.  He also borrowed an additional $500,000 from Balagiannis to cover legal fees in the lawsuit brought by Rose.  (*Id.*).

In consideration for the $4.5 million loan, Costas agreed to sell Balagiannis a 34% stake in Theros.  (*Compl.* ¶ 13).  Under that agreement, Costas would apply the $4.5 million loan against the purchase price of Balagiannis' shares.  (*Id.*).  This agreement, which was memorialized in a written contract, provided that "[t]he competent courts for any dispute which may arise shall be the Courts of Athens."  (*Id.*, Ex. A ¶ 24).

Ted and Costas then set up an escrow at Chicago Title & Trust Company to close the sale of Ted's shares to Costas.  (*Compl.* ¶ 12).  Under the terms of the escrow, Costas was required to deposit the $4 million in cash, the $5 million promissory note and the release from Rose and Ted was required to deposit his shares in Theros.  (*Id.*).  When all items were deposited, Chicago Title was instructed to distribute the shares to Costas and the cash, promissory note and release to Ted.  (*Id.*).  If the transaction failed to close, however, Balagiannis' consent was required before Chicago Title could release his funds.

On or before September 1, 2003 Balagiannis wired $3.7 million to the Chicago Title escrow account.  (*Compl.* ¶ 14).  He also sent $800,000 directly to Costas who promised to deposit $300,000 into the escrow and apply the remaining $500,000 towards legal fees.  (*Id.*).

2

By October, however, Costas had not deposited a release from Rose or the $5 million promissory note into the escrow account and Ted had not deposited his shares in Theros. (*Id.* ¶¶ 17-18). Since the terms of the purchase could not be met, the Mavrakis brothers decided to terminate the escrow. (*Id.* ¶¶ 17-18).

Although the $3.7 million in the escrow could not be released without Balagiannis's consent, the Mavrakis brothers hatched a plan to acquire the money. First, they told Balagiannis that the money must be held by Ted to preserve Costas' right of first refusal and, by extension, Balagiannis' right to purchase a 34% interest in Theros. (*Compl.* ¶ 19). To lend credibility to the arrangement, Ted sent Balagiannis' lawyer a letter on October 22, 2003 affirming that "your funds (USD 4,000,000) shall not be at risk in any case" and "also giving you my personal guarantee." (*Id.* ¶ 16; *Compl.*, Ex. B). Ted further promised that if Balagiannis changed his mind, he would "gladly purchase [his] rights at the same consideration." (*Id.*).[3]

Relying on Ted's guaranty, Balagiannis' lawyer authorized Chicago Title to release the $3.7 million held in escrow to Ted who transferred the money into a personal account in Greece. (*Compl.* ¶ 18). Over the next three and half years, Ted repeatedly told Balagiannis that he was holding the money to keep Costas' right of first refusal open. (*Id.* ¶ 19). On March 31, 2007, Ted sent a letter to Costas, which was copied to Balagiannis, stating that he still held Balagiannis' money and was prepared to either consummate the transaction or return Balagiannis' funds. (*Id.* ¶ 20; *Compl.*, Ex. C).

After receiving the March 31, 2007 letter, Balagiannis learned several distressing facts. First, Costas apparently spent the $800,000 that was not wired directly to the escrow account for personal expenses, though he testified under oath that he gave $300,000 of that amount to Ted. (*Compl.* ¶ 14). Second, despite promising that he would not put Balagiannis' money at risk, personally guaranteeing repayment of $4 million, and confirming that he was holding Balagiannis' money to secure Costas' right of first refusal for three and half years, Ted recently testified that he gave the entire $3.7 million to Costas in October of 2003 immediately after he received it from the escrow account at Chicago Title. (*Id.* ¶ 21).

Balagiannis now seeks to enforce Ted's personal guaranty and asserts claims against Ted for promissory estoppel and fraud. In response, Ted argues that Balagiannis' complaint should

---

[3] Ted also met with Balagiannis and Balagiannis's lawyer (Katserilis) in Greece in October, 2007. During that meeting Ted reiterated his promise to return the $3.7 million that was originally deposited in the escrow to Balagiannis if so requested by Balagiannis.

3

be dismissed because he fails to state a claim under which relief may be granted and because his brother Costas is an indispensable party who cannot be joined without depriving this Court of subject matter jurisdiction over this dispute. For the reasons that follow, the court should deny Ted's motion.

## ARGUMENT

When considering a Rule 12(b)(6) motion to dismiss, the Court accepts the complaint's factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). A complaint should not be dismissed if it asserts the "operative facts" upon which each claim is based, *Kyle v. Morton High Sch.*, 144 F.3d 448, 454-55 (7th Cir. 1998), and provides allegations that "plausibly suggest that the plaintiff has a right to relief," *E.E.O.C. v. Concentra Health Serv.*, 496 F.3d 773 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007)). Under this standard, a plaintiff is not required to plead all facts establishing his or her cause of action and "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994). In fact, the federal notice pleading standard even allows a plaintiff to plead conclusions so long as they "provide the defendant with at least minimal notice of the claim." *Kyle,* 144 F.3d at 455; *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002).

**I.   The Court Should Deny Defendant's Motion to Dismiss this Action under Rule 12(b)(7) Because Costas Is Not an Indispensible Party**

Ted argues that the Court should dismiss this entire action under Rule 12(b)(7) because his brother Costas is an indispensable party and joining him would deprive the Court of subject matter jurisdiction. (D.20 *Def.'s Mem.*, pp. 11-15). Although Ted correctly notes that joining Costas as a party to this action would defeat the Court's diversity jurisdiction, he fails to explain why his brother is an indispensable party under Rule 19(a) or weigh any of the equitable factors under Rule 19(b).

**A.   Costas Is Not an Indispensible Party to this Action**

For purposes of Rule 19 joinder or dismissal, Costas may be considered an "indispensable" party only if:

(A) in [his] absence, the court cannot accord complete relief among existing parties; or

4

> (B) [Costas] claims an interest relating to the subject of the action and is so situated that disposing of the action in [his] absence may: (i) as a practical matter impair or impede [his] ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a). Here, Ted has guaranteed payments of certain amounts lent to Costas by Balagiannis. The Seventh Circuit has expressly held that in an action against a guarantor, the borrower is not an indispensable party under Rule 19(a). *Boulevard Bank Nat'l Ass'n v. Philips Med. Sys. Int'l B.V.*, 15 F.3d 1419, 1423 (7th Cir. 1994). Accordingly, Costas is not an indispensable party in this case so there is no need to even decide whether this action may, in equity and good conscience, proceed without him. *Id.*

Furthermore, Ted fails to identify exactly what provision of section 19(a) makes Costas an indispensable party. Ted first argues that Costas is an indispensable party -- apparently under subsection (B)(i) -- because Costas might be prejudiced if his rights to Balagiannis' funds are adjudicated in his absence. (*Def.'s Mem.*, p. 12). That, however, is not an issue in this lawsuit. Balagiannis does not seek to impose a constructive trust on any funds or asset Ted is holding. Instead, Balagiannis simply seeks to recover damages against Ted arising from Ted's (a) breach of his agreement, (b) failure to honor his promises and (c) fraudulent representations. None of these claims have any conceivable affect on Costas' legal rights.

Ted also argues that Costas is an indispensable party -- apparently under subsection (B)(ii) --because Ted might be subject to an inconsistent judgment if Costas sues him to get the $3.7 million fund. (*Def.'s Mem.*, pp. 12-13). First, Ted has offered no explanation of any claim that Costas could assert against Ted for this "fund". Second, Ted has testified under oath that he does not have the money, but instead transferred it to Costas in 2003. (*Compl.* ¶ 21). If there is no fund that Costas could have a claim to, then there is no risk of Costas asserting a claim against that "fund."

Finally, if Ted has the money and if he was truly concerned about this threat, Ted could have filed an interpleader action in state court and let Costas and Balagiannis sort it out. *See*, 735 ILCS 5/2-409. But that is not his concern, since Ted has stated under oath that he gave all of Balagiannis' money to his brother Costas in 2003. Moreover, as noted above, Balagiannis' claims against Ted are unrelated to any legal rights Costas might assert against Ted. For these reasons, Costas is not indispensable to this litigation.

### B. Even If Costas Was an Indispensible Party, the Court Should in Equity and Good Conscience Allow this Action to Proceed between the Existing Parties

Even if Costas is an indispensable party to this case—which he is not—this Court should, in equity and good conscience, allow this action to proceed without him. In determining whether to proceed without an indispensable party a court should consider the following factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

FED. R. CIV. P. 19(b). An examination of these four factors leads to the inevitable conclusion that this matter should proceed without Costas.

With regard to the first and second factors, as explained above, there is no prejudice to Costas if this action proceeds without him and, therefore, there is no need to even consider any method to avoid that prejudice. As to the third factor, there is also no question that Balagiannis can obtain adequate relief without Costas being made a party.

The fourth factor, however, dictates that this matter should proceed because if the Court dismisses this action for failure to join Costas as an indispensable party, Balagiannis would potentially be left with no remedy. Ted has already indicated in open court that if Costas is named as a party, Ted intends to argue that the contract would require that the action proceed in Athens, Greece. However, Ted may not be subject to jurisdiction in Greece. That would result in Balagiannis not being able to sue Ted anywhere, because Balagiannis would not be able to proceed in the United States against Ted, since Costas cannot be joined here, and would not be able to sue Ted in Greece, because Ted is not subject to that court's jurisdiction. Thus, a dismissal on the basis requested by Ted could leave Balagiannis with no remedy. *Zwack v. Kraus Bros. & Co.*, 237 F.2d 255, 259 (2d Cir. 1956) (Courts "properly strain to avoid" dismissing lawsuits under Rule 19 if it would deprive the plaintiff of a remedy, for that would allow the defendant to accomplish precisely that which the law forbids).

For the all of the reasons set forth above, this Court should deny Ted's Rule 12(b)(7) motion to dismiss.

## II. The Court Should Deny Defendant's Motion to Dismiss Count II of the Complaint Because Plaintiff Has Sufficiently Alleged a Claim to Enforce a Personal Guaranty

Ted also argues that Balagiannis' claim to enforce the personal guaranty should be dismissed because: (1) the letter did not create a guaranty, (2) the guaranty was not supported by consideration and (3) the guaranty was a guaranty of collection not payment. These arguments are without merit.

### A. The Language Ted Used Was Sufficient to Create a Guarantee Under Illinois Law

Ted argues first that the language in his letter to Balagiannis did not create a guaranty. (*Def. Mem.*, p. 5). In considering this argument, it must be remembered that this is a motion to dismiss and, as previously noted, all allegations of the complaint should be taken as true and all inferences should be drawn in favor of Balagiannis and against Ted.

No formal language is required to create a guaranty under Illinois law, however, so "[a]ny kind of writing, from a solemn deed to a mere hasty note or memoranda, from which the intention of the parties may be gathered will be sufficient" to create a guaranty. *McCracken v. Olson Companies, Inc.*, 149 Ill. App. 3d 104, 112-13, 500 N.E.2d 487, 492-93 (1st Dist. 1986). In *McCracken*, for example, the court found that a memorandum evincing a person's promise to pay an obligation created a guaranty even though the word "guaranty" was not used. *Id.*

Here, Ted affirmed that Balagiannis' $4 million "shall not be at risk in any case," and promised that "I am also giving you my **personal guarantee**." (*Compl.*, Ex. B, emphasis added). He further promised Balagiannis that "if you change your mind, for any reason, I will gladly purchase, myself, your rights at the same consideration."[4] (*Id.*). Balagiannis has alleged that this letter constitutes a guaranty and the language of the agreement supports that allegation. In fact, the document in question expressly states that Ted is providing his "personal guaranty". (*Id.*). Accepting that allegation as true, and the reasonable inferences that can be drawn from the language of the letter, Balagiannis has pleaded facts that state a claim on the guaranty.

---

[4] A guaranty is "an agreement by one or more parties to answer to another for the debt or obligation of a third party." *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 620, 863 N.E.2d 743, 758 (1st Dist. 2007). Because Mavrakis made this promise in addition to guaranteeing repayment of the loan, Balagiannis will seek leave to amend his complaint and add a breach of contract claim against him.

7

Ted contends that the language in his letter did not create a guaranty for two reasons. First, Ted argues that his letter did not guaranty repayment of the $4 million loan from Balagiannis to his brother Costas because "[t]he Preliminary Agreement does not require Costas to return any amount to Balagiannis." (*Def.'s Mem.*, 5). This point is irrelevant. Balagiannis does not allege that Ted guaranteed Costas's obligations under the agreement. Instead, Balagiannis claims that Ted guaranteed the return of $4 million and that it would not be at risk. Ted also agreed to purchase Balagiannis's position for $4 million. So, reading the agreement in a light most favorable to Balagiannis, Ted guaranteed that he would repay the $4 million to Balagiannis if the deal did not go through.

Second, Ted argues that "if there was any doubt about the meaning of [his] alleged promise, it would have to be construed against Balagiannis." (D.20 *Def. Mem.*, p. 5). However, the case that Ted relies on is a case dealing with the construction of the meaning of the document at trial, not how it should be construed in the context of a motion to dismiss. In connection with a motion to dismiss, all reasonable inferences must be drawn in favor of Balagiannis, not Ted. *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d at 753.

Even if Ted were entitled to such a construction at the motion to dismiss stage, Ted is only entitled to the benefit of the doubt "where some doubt arises as to the meaning of the guaranty language," *T.C.T. Bldg. P'ship v. Tandy Corp.*, 323 Ill. App. 3d 114, 118, 751 N.E.2d 135, 139 (1st Dist. 2001). In this case there is no doubt that Ted intended to guaranty the payment of the $4 million in the event that the deal did not go through. Also, Ted identifies no ambiguity or uncertainty in his letter that raises any such doubt that would give rise to such a construction.

Finally, if there was an ambiguity in the guaranty, the Court should consider extrinsic evidence to resolve it. Under Illinois law, "[a] guaranty is a contract and should be interpreted according to the standards that govern the interpretation of contracts in general." *T.C.T. Bldg. P'ship v. Tandy Corp.*, 323 Ill. App. 3d 114, 118, 751 N.E.2d 135, 139 (1st Dist. 2001). If a guaranty is ambiguous or unclear so that the intentions of the parties cannot be discerned from the document itself, the court may consider extrinsic evidence to interpret it and even cure defective draftsmanship through such evidence. *First Nat. Bank of Oak Lawn v. Minke*, 99 Ill. App. 3d 10, 14, 425 N.E.2d 11, 15 (1st Dist. 1981). Accordingly, in *Minke*, the court reversed dismissal of the plaintiff's complaint and observed that the defendant could raise any alleged

8

ambiguities in his answer. *Id.*[5] Both cases cited by Ted were resolved on motions for summary judgment supported by fully developed factual records. *See*, *Emrick v. First Nat'l Bank of Jonesboro*, 324 Ill. App. 3d 1109, 756 N.E.2d 914 (5th Dist. 2001); *Lincoln Park Fed. Sav. & Loan Ass'n v. Carrane*, 192 Ill. App. 3d 188, 548 N.E.2d 636 (1st Dist. 1989).

Ted's motion to dismiss, which must accept all well-pleaded facts as true, cannot be used to resolve the fact intensive issue of the proper interpretation of an allegedly ambiguous contract. Instead, that is a defense that Ted is entitled to raise, but one that cannot be resolved pursuant to a motion to dismiss.

Accordingly, the rule of construction cited by Ted, although potentially applicable in interpreting an agreement at trial or during summary judgment, cannot serve as a basis for dismissing Balagiannis guaranty claim.

### B.  Defendant's Guaranty Was Supported by Consideration to Both Mavrakis Brothers

Ted argues next that Balagiannis supplied no consideration for his guaranty. (D.20 *Def. Mem.*, pp. 6-7). This argument simply ignores the facts of the transaction. When the Mavrakis brothers terminated the escrow account at Chicago Title, the funds could not be released from the escrow without Balagiannis's consent. However, Ted persuaded Balagiannis to release the money from the escrow account directly to Ted even though the stock sale had not closed. Ted accomplished this by providing Balagiannis' with Ted's personal guaranty that Balagiannis's funds would not be lost. These promises and actions, including releasing the money from the escrow to Ted, constitute consideration to Ted for the guaranty. This "bargained for exchange of promises and performance" constitutes consideration for the guaranty. *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1027, 864 N.E.2d 927, 937 (1st Dist. 2007).

Furthermore, even if Ted were to argue that only Costas received consideration, because Costas ultimately received the money, that consideration paid to Costas is still sufficient to bind Ted under the guaranty. "A promise based on consideration to benefit a third person constitutes

---

[5] Both cases cited by Ted were resolved on motions for summary judgment supported by fully developed factual records, not motions to dismiss. *See*, *Emrick v. First Nat'l Bank of Jonesboro*, 324 Ill. App. 3d 1109, 756 N.E.2d 914 (5th Dist. 2001); *Lincoln Park Fed. Sav. & Loan Ass'n v. Carrane*, 192 Ill. App. 3d 188, 548 N.E.2d 636 (1st Dist. 1989).

sufficient consideration to bind the guarantor." *Id.* at 1028, 864 N.E.2d at 937.  Accordingly, this argument also fails to serve as a basis for dismissing Balagiannis's guaranty claim.[6]

### C. Ted's Letter Guaranteed Payment, Not Mere Collection

Finally, Ted argues that his guarantee was one of collection not payment. (D.20 *Def. Mem.*, p. 7-8).  The only case he cites, however, stands for the opposite proposition.  Ted stated in his letter to Balagiannis that "I am also giving you my personal guarantee."  According to two opinions from the Illinois Supreme Court—both of which are discussed in *Floor v. Melvin*, 5 Ill. App. 3d 463, 283 N.E.2d 303 (3d Dist. 1972)—this language guarantees payment, not collection. *Beebe v. Kirkpatrick*, 321 Ill. 612, 152 N.E. 539 (1926) (holding that the language "I hereby guarantee this loan" created guaranty of payment); *Hance v. Miller*, 21 Ill. 636 (1859) (holding that the language "I guarantee payment of the within note at maturity" created guaranty of payment).

Ted claims that his guaranty that Balagiannis' money "shall not be at risk in any case" is analogous to the guaranty "against loss" in *Floor v. Melvin*, 5 Ill. App. 3d 463, 283 N.E.2d 303 (3d Dist. 1972).  (*Id.* at 7).  However, the court in *Floor* held that "[w]hile it is true that the word 'collection' has not been used, in our view the guarantee as against 'loss' is in effect a guarantee of collection rather than payment." *Floor v. Melvin*, 5 Ill. App. 3d 463, 466, 283 N.E.2d 303, 305 (3d Dist. 1972).  Ted's language and the unconditional guaranty in the next sentence of his letter do not create any such qualification.[7]  Again, to the extent this language is ambiguous, its meaning should not be resolved pursuant to a motion to dismiss.

### III. The Court Should Deny Defendant's Motion to Dismiss Count III of the Complaint Because Plaintiff Has Sufficiently Alleged a Claim for Promissory Estoppel

Ted argues that Count III should be dismissed because he made no promise to Balagiannis.  Alternatively, Ted argues that Balagiannis did not reasonably rely upon the promise.

---

[6] To the extent that this Court believes that this consideration is not sufficiently pled in the complaint, Balagiannis requests leave to file an amended complaint that includes these allegations in more detail.

[7] At best, Ted could argue that the language is ambiguous, which would not provide a basis for dismissing the claim, but would only provide Ted with a possible defense.

10

### A.    Promise

Ted argues that the Court should dismiss Count III because the promise in Exhibit C was made to Costas not Balagiannis. (*Def.'s Mem.*, pp. 8-9). There are a number of problems with this argument. First, and foremost, Balagiannis did not allege the promise to return the funds was only contained in the letter of March 31, 2007. Instead, Balagiannis alleges in Count IV that Ted represented in the letter of March 31 that he held the $3.7 million. Complaint, ¶34. Then Balagiannis alleges that Ted promised that he would repay those funds if the transaction did not go through. Balagiannis does not allege, as Ted argues, that the promise was contained solely in the letter attached as Exhibit C to the complaint. What's more, Ted also promised to guaranty Balagiannis' $4 million—a promise that is wholly overlooked in his motion to dismiss. If the guaranty cannot be enforced as a guaranty or a contract because of lack of consideration, then Balagiannis is entitled to assert this claim for promissory estoppel based on the promises contained in that letter.

Ted also ignores that he intentionally copied the letter to Balagiannis. (*Def.'s Mem.*, p. 8). Although Mavrakis addressed the letter "to" his brother and only copied it Balagiannis, it is reasonable to infer that the sole purpose of the letter was to induce Balagiannis' reliance and defraud him. Because both Mavrakis brothers knew that Ted withdrew Balagiannis' money from Ted's checking account in Greece and gave it to Costas in 2003, the letter was written with the sole intention of misleading Balagiannis into believing that Ted still had it. The letter was not really "to" Costas at all.

### B.    Reasonable Reliance

Mavrakis argues that Balagiannis' reliance on the letter was not reasonable or foreseeable. (*Def.'s Mem.*, p. 9). Under Illinois law, the issue of reasonable reliance "is generally considered a question of fact." *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 652, 762 N.E.2d 1, 9 (1st Dist. 2001). Given that the question of Balagiannis's reliance on the promise is an issue of fact, it cannot be resolved on a motion to dismiss. *Thompson*, 300 F.3d at 753.

Moreover, even if this issue could be addressed pursuant to a motion to dismiss, it is certainly reasonable to infer that the letter and the verbal promises were intended to induce reliance on the part of Balagiannis, given that Costas and Ted both knew that Ted no longer held the deposit that is the subject of the letter.

### IV.      The Court Should Deny Defendant's Motion to Dismiss Count IV of the Complaint Because Plaintiff Has Sufficiently Alleged a Claim for Fraud

Finally, Ted argues that Balagiannis' fraud claim should be dismissed because (1) Balagiannis merely asserts "blanket allegations" of fraud and (2) Balagiannis could not have reasonably relied upon his fraudulent misrepresentations. For the following reasons, these arguments should be rejected.

#### A.      Balagiannis' Complaint Includes More than "Blanket Allegations" of Fraudulent Misrepresentations

Ted argues that Balagiannis makes only one sweeping allegation of fraud in paragraph 40 of his complaint. (*Def.'s Mem.*, pp. 9-10). This argument simply ignores the complaint's remaining allegations which are replete with names, dates and specific misrepresentations including those in the written documents attached as exhibits and incorporated by reference therein. For example:

- On October 22, 2003, Ted guaranteed the safety of Balagiannis' money in a letter even though he planned to give the money to Costas all along (D.1 Compl. ¶ 16);

- Between October 2003 and March 2007 Ted orally misrepresented that he was still in possession of Balagiannis' money even though he had given it to Costas in October 2003 (D.1 Compl. ¶¶ 19, 21); and

- On March 31, 2007, Ted sent a letter to Balagiannis again misrepresenting that he was still in possession of Balagiannis' money even though he had given it to Costas in October 2003 (D.1 Compl. ¶¶ 20, 21).

#### B.      Ted Has Not Shown that there Are No Set of Facts under which Balagiannis Could Prove that He Reasonably Relied on Ted's Misrepresentations

Ted also argues, as he does with respect to Balagiannis' claim for promissory estoppel, that Balagiannis could not have reasonably relied on his statements. (D.20 *Def.'s Mem.*, pp. 10-11). As noted above, the issue of reasonable reliance is generally considered a question of fact unsuitable for resolution on a motion to dismiss, *Miller*, 326 Ill. App. 3d at 652, 762 N.E.2d at 9. Moreover, Ted offers no explanation why Balagiannis' could not have reasonably relied on Ted's statements that he had Balagiannis' money. Surely if Ted had told Balagiannis that he had given the money to Costas years ago and that the money was gone, Balagiannis would have pursued his remedies at the time, rather than waiting nearly another year. The only reasonable

12

inference to be drawn from the facts alleged is that Balagiannis did rely on Ted's intentional misrepresentations in this matter.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant Theodore Mavrakis' Motion to Dismiss Counts II, III and IV of Plaintiffs' Complaint.

Dated:  May 29, 2008

Respectfully submitted,

NICOLAS BALAGIANNIS and RESERVE HOTELS PTY LIMITED as trustee for the NBF TRUST, Plaintiffs


By:     /s/  John M. Heaphy
        One of Their Attorneys

John M. Heaphy
George N. Vurdelja, Jr.
HARRISON & HELD, LLP
333 West Wacker Drive
Suite 1700
Chicago, Illinois 60606
(312) 332-1111

13

**SERVICE OF DOCUMENTS BY ELECTRONIC MEANS**

The undersigned hereby certifies that on May 29, 2008, he caused the foregoing document to be filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, by using its Electronic Case Filing System which will send a Notice of Electronic Filing to the following Filing Users:

**Bruce N. Menkes**

**John D. Fitzpatrick**

**Lindsay H. LaVine**

The undersigned also certifies that on the above date he caused the foregoing document to be mailed by United States Postal Service to the following non-Filing Users:

(Not Applicable)

                                              /s/     John M. Heaphy
                                              HARRISON & HELD, LLP
                                              Attorney for Plaintiffs
                                              333 West Wacker Drive
                                              Suite 1700
                                              Chicago, Illinois 60606
                                              Phone: (312) 332-1111
                                              Fax:    (312) 332-1150
                                              Email: jheaphy@harrisonheld.com