IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **NICHOLAS BALAGIANNIS and RESERVE HOTELS PTY LIMITED, As Trustee for the NBF TRUST,** <br><br> Plaintiffs, <br><br> v. <br><br> **THEODORE MAVRAKIS,** <br><br> Defendant. | Case No. 08 C 943 <br><br> Hon. Harry D. Leinenweber |

### MEMORANDUM OPINION AND ORDER

This case is now before the Court on the Defendant's Motion for Summary Judgment on Counts I (Breach of Contract), II (Promissory Estoppel), and III (Common Law Fraud). The Court previously ruled on Defendant's Motion to Dismiss which was directed at the previous Complaint, granting the Motion without prejudice as to Count II (now Count I), with leave to amend, and denied the Motion as to Counts III and IV (now Counts II and III). The basis for dismissing the old Count II was the failure of Plaintiff to allege consideration for a guarantee. Plaintiff has since amended his Complaint to allege breach of contract (rather than breach of guarantee) as well consideration for the alleged contract.

I. **BACKGROUND**

The factual setting for this dispute is the alleged agreement on the part of Defendant, Theodore Mavrakis (the "Defendant"), to sell his shares in Theros Gaming International, Inc. ("Theros"), the corporate owner of a Greek casino located in Patras, Greece.

The following facts are taken from the parties' respective Local Rule 56 statements. Initially, the Court notes that the Defendant has been extremely evasive in his response to Plaintiff's Rule 56.1 Statement of Additional Facts. He repeatedly responds to Plaintiff's statement by making partial admissions followed by the following boiler plate qualification: ". . . and denies that the remainder of the statement is supported by the record citation." The Seventh Circuit has repeatedly stated that Local Rule 56.1 is "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000). To give an example here, Plaintiff's Additional Statement No. 2 says: "As of January 27, 1999, Ted and Costas Mavrakis, Ted's brother, each owned 43,6875% of the shares of Theros. Michael Rose owned the remaining shares." To which Defendant's response was "Ted admits only that Ted and Costas Mavrakis at one time each owned 43 percent of the shares of Theros and denies that the remainder of the statement is supported by the record citation." It defies common sense to assert that a major shareholder of a very

closely held corporation (three shareholders), would not know as of January 27, 1999, who owned the other shares of Theros. Another example: Statement No. 11: "In order to close the purchase by Costas of Ted's shares in Theros, an escrow was created between Ted and Costas, to which Balagiannis was not a party." Defendant's response: "Ted denies the statement because the documents Plaintiffs attach to the ASOF are illegible. Ted does admit that he and Costas were parties to an escrow account." Why in the world Defendant would not be able to admit that Balagiannis was or was not a party to the escrow account to which he was a party is baffling to say the least. As the Seventh Circuit stated in *Bordelon*, District courts are not obligated to wade through improper denials in search of genuinely disputed facts. So the Court, while not striking Defendant's response, will deem admitted those facts that clearly are in the knowledge of Defendant and are denied solely based on what he perceives as not being supported by the record citation.

## II. **FACTS**

At the time of the alleged agreement Defendant and his brother, Costas Mavrakis ("Costas"), owned approximately 43.5% of the corporate owner, Theros International Gaming, Inc. Defendant entered into an agreement with a third party, Anakon Investments, Ltd. ("Anakon"), to sell his shares in Theros for $4 million in cash, a $5 million promissory note, and a release from Rose, the

shareholder, who owned the approximate 13% remainder of Theros shares. Costas after learning of the proposed sale of Defendant's shares to Anakon invoked what he claimed was his right of first refusal and demanded that Theodore sell him his shares for the same consideration as given to Anakon. In order to finance the proposed purchase of Defendant's shares, Costas entered into an agreement with Nicholas Balagiannis (the "Plaintiff") to transfer 34% of Theodore's shares to Plaintiff after the purchase was completed for the price of $6,954,530. (The transfer was to be made to Plaintiff individually or to an entity to be named by Plaintiff.) The Plaintiff originally intended to name Reserve Hotels Pty, Ltd. ("Reserve"), as Trustee for the NBF Trust, as the designee for the ownership of the shares but this did not come to pass. (The Plaintiff agrees that Reserve should therefore be dismissed from this suit.) This sum was to be paid as follows: by the deposit of $4 million in an escrow to be used to close on Costas' acquisition from Defendant and the remaining amount would be used to make the majority of the first three payments due on the $5 million promissory note due to Defendant. The Plaintiff also agreed to lend $500,000 to Costas to pay his attorneys' fees in connection with a dispute over Costas' right to purchase the shares from Defendant then pending in a Chicago court. Plaintiff also advanced Costas an additional $300,000 with the understanding that he would deposit that sum into the escrow account.

The establishment of the escrow account was a term of Costas' agreement with Defendant to which he and Defendant would be the only parties. The terms of the Escrow Agreement were that Defendant would deposit his shares in Theros and Costas would deposit the $4 million cash, the $5 million promissory note and the release form the remaining shareholder. When the required deposits were made, the Escrow Agent would release the shares to Costas and the cash, note, and release to Defendant.

In August 2003 Plaintiff was asked to deposit the $4 million into the Escrow. However, because he was not a party to the escrow Plaintiff was reluctant to do so. Plaintiff through his counsel, Konstantinos Grekos ("Grekos"), requested that Costas agree that the funds not be released from the Escrow without Plaintiff's agreement unless the terms of the Escrow were satisfied. By letter dated August 27, 2003, Costas and his attorney, Robert Nieman ("Nieman"), agreed to this. Thereafter, on September 1, 2003, Plaintiff caused $3,700,000 to be deposited in the Escrow. This sum plus the $300,000 already advanced to Costas was to satisfy the $4 million cash requirement due Defendant. In October, Costas and Defendant apparently concluded that the terms of the Escrow could not be satisfied, and Costas' attorney directed the Escrow Agent to disburse the Escrow Funds to a Greek bank in Defendant's name to serve as a deposit while Costas continued with his efforts to purchase the shares from Defendant. At that time Defendant knew

the funds came from Plaintiff and their intended use was to purchase Defendant's shares.

On October 21, 2003, Plaintiff's lawyer spoke to Defendant by telephone wherein Defendant agreed that the money in escrow would not be at risk and Defendant would purchase Plaintiff's rights under his agreement with Costas for $4 million at any time that Plaintiff requested. Based on this assurance, the lawyer executed a written direction to release the funds to a bank account in Greece in Defendant's name. The lawyer then drafted the terms of this agreement in a handwritten letter which he faxed to Defendant on October 21, 2003. Defendant signed the letter and faxed it back to the attorney on October 22, 2003. On October 24, 2003, the sum of $3,703,606.80 held in the escrow was released and sent to Defendant's Greek bank account.

In late 2003 or early 2004, the parties and their attorneys met in Athens during which Defendant represented to Plaintiff and his attorney that if he did not want to continue the transaction, that Defendant would purchase Plaintiff's rights under his agreement with Costas within 20 to 30 days after notice from Plaintiff. On February 2, 2007, Plaintiff's lawyer sent a letter to Defendant requesting that Defendant purchase Plaintiff's rights pursuant to the terms of their Agreement. While Defendant did not respond to this letter, he did send a letter to Costas, with a copy to Plaintiff, on March 31, 2007, stating that he had the funds on

deposit and would return them if the parties wished to cancel the transaction. This was false because almost all of the funds save $17,000 had been distributed to Costas by January 27, 2004. Defendant claims that he made these transfers to Costas as gifts. However, he did not file any gift tax returns. None of Plaintiff's money has been returned to him and he has received no shares in Theros.

### III.  **ARGUMENT**

#### A.  **Count I**

Count I of the Second Amended Complaint alleges that Defendant breached the October Agreement by refusing to purchase Plaintiff's rights under the Stock Purchase Agreement with Costas. The Agreement allegedly breached consisted of a telephone conversation between Plaintiff's attorney and Defendant on October 21, 2003, which was reduced to writing, faxed to, and signed by Defendant, and, returned by fax to Plaintiff. Defendant acknowledges that he signed the fax. Defendant contends that there was no consideration given by Plaintiff in exchange for the agreement, that the attorney was not authorized by Plaintiff, and that the agreement is imprecise.

It is clear that there was in fact consideration for Defendant's promise to purchase Plaintiff's interest. The Plaintiff had been requested to deposit the $4 million into the escrow. He was reluctant to do so because he was not a party to

the escrow. Based on Defendant's agreement not to withdraw the money without Plaintiff's consent, the money was deposited into the escrow. An oral agreement was subsequently reached whereby Defendant agreed to repurchase Plaintiff's interest at the price of $4 million if the transaction did not go through. Based on this promise Plaintiff agreed to the withdrawal of the money he deposited into the escrow. It would defy reason to suppose that Plaintiff would authorize the release of the funds without assurance that he would get either the shares or his money back. In short it is clear that the evidence is sufficient to support a finding that there was consideration for the promise to repurchase the shares by Defendant in the form of Plaintiff's agreement to allow withdrawal of the funds. Consideration is "some form of bargained for exchange between the parties." *Midwest Builder Distributing, Inc. v. Lord and Essex, Inc.*, 383 Ill.App 3d 645, 658 (1st. Dist. 2007).

The next point raised by Defendant in his Motion is his contention that Plaintiff's attorney who obtained the agreement from Defendant did not have authority to enter into the alleged agreement. Defendant bases his claim on the allegation of a lawsuit filed by Plaintiff in Greece against his attorney. The argument is that Defendant could not enforce the agreement against Plaintiff and therefore mutuality was lacking. However, this argument fails because the Defendant has already obtained all of

the benefits to which the agreement entitled him. He agreed that in return for allowing the withdrawal of the funds he would agree to repurchase Plaintiff's interest should Plaintiff request. He withdrew the funds but did not live up to his side of the bargain. He did not repurchase Plaintiff's rights after a request to do so. Defendant argues that he could not enforce his rights under the alleged agreement. But what rights are left to enforce? He withdrew the money which was all he was entitled to. Plaintiff ratified the agreement by allowing the escrow withdrawal and by requesting Defendant to purchase his rights against Costas.

Defendant's final argument against Count I is that the terms are imprecise. The court can agree that the alleged agreement is poorly drafted. However this is not to say that it would be unenforceable. It is clear that the parties understood the terms of the agreement. In return for the release of the funds Defendant assured Plaintiff that his funds would not be at risk if the money was withdrawn from the escrow because he would agree to purchase Plaintiff's rights for $4 million in the event Plaintiff was unsuccessful in obtaining the Theros stock. Accordingly the Motion for Summary Judgment on Count I is denied.

## B. Count II

Defendant moves for summary judgment on Count II (promissory estoppel) contending that the Illinois Statute of Frauds (740ILCS 80/1 bars this count and that in any event the so-called promise is

ambiguous. Plaintiff points out Section 80/1 is limited to guarantees of "debt, defaults, or miscarriage of another person." However, Count I is no longer based on a guarantee but rather breach of contract. Here the promise was not to guarantee money owed by Costas. At that time Costas had not been paid any money by anyone. He was attempting to obtain shares in Theros stock from Defendant, which he apparently was unable to do. The promise was on the part of Defendant to, in effect, repay the money he obtained from Plaintiff for which he gave no consideration. Thus, the Statute of Frauds does not apply. In any event, there is a memorandum in writing signed by Defendant upon which Count I is based. Defendant repeats his argument that the promise made by Defendant was ambiguous. For the reasons set forth above the court finds that the alleged promise is sufficiently clear so as to deny Summary Judgment on Count II.

### C. Count III

The final count is Count III, common law fraud. First, Defendant argues that there is no evidence that Plaintiff relied on any misrepresentation of Defendant. Defendant contends that Plaintiff has acknowledged that Defendant might move the funds from the Greek bank account to which they had initially been transferred. He also acknowledged that Defendant could use the money for investment or other purposes. The statement he relied upon was Defendant's assurance that he would repay the money if

- 10 -

Plaintiff asked or if he was unable to obtain the Theros stock. Thus, it would appear that Plaintiff is relying on a statement of future intentions or promises of conduct to be carried out in the future. Under Illinois law a promise to perform an act, though accompanied at the time with an intention not to perform it, is not such a false representation as will constitute fraud sufficient to predicate thereon a cause of action. *Roda v. Berko*, 401 Ill. 335 (1948). Plaintiff cites Defendant's letter to Costas (on which he was copied) which was sent in 2007, which promises Costas that he will refund the money if Costas wants to void the proposed sale. (Defendant's Sum. Jud. Ex. K). However the "promise" is made to Costas, not Plaintiff. Accordingly, the court grants Defendant's Motion for Summary judgment on Count III.

### III. CONCLUSION

For the reasons stated herein, the Court rules as follows:

1. Reserve is dismissed as a party Plaintiff with prejudice;

2. Defendant's Motion for Summary Judgment is Denied as to Count I (contract) and Count II (promissory estoppel), but is Granted as to Count III (Fraud).

**IT IS SO ORDERED.**

                                                                                    _____
                                                                                    Harry D. Leinenweber, Judge
                                                                                    United States District Court

**DATE:** 10/31/2011

- 11 -